CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2016 DEC -8  PM 2: 30

DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## SAN ANGELO DIVISION

| | | |
|---|---|---|
| CLIFTON C. HOYT, | § | |
| Institutional ID No. 36202, | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | No. 6:15-CV-0003-BL |
| | § | |
| BIG SPRING STATE HOSPITAL, et al., | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to 42 U. S. C. § 1983 and Texas law, Plaintiff sues Big Spring State Hospital ("BSSH"); its Superintendent, Lorie Dunnam in her official capacity; two BSSH doctors (Cormack and Butler) and two nurses (Brown and Edmondson) in their individual capacities; and Howard County, a municipal entity.[1] *See, generally*, Compl. (doc. 1). Based on the Plaintiff's Consent to Proceed Before a United States Magistrate Judge (doc. 5), the United States District Judge reassigned the case to the undersigned pursuant to 28 U.S.C. § 636(c) subject to the consent of defendants. *See* Order (doc. 7).

On April 28, 2015, the Court set the matter for an evidentiary hearing, pursuant to *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), and ordered BSSH and Howard County officials to provide authenticated copies of relevant institutional records. *See* Order Setting Evidentiary Hearing (doc. 8). BSSH provided relevant records. On June 11, 2015, Plaintiff testified at the hearing. *See* Minute Order (doc. 14). After considering Plaintiff's complaint, supplemental filings, testimony from the hearing, the administrative record, and the applicable law, the Court

---

[1] Plaintiff misspelled two names in his complaint. *See* Compl. at 1 (using "Dunnhm" and "Carmack"). The Court uses the correct spelling as found in the administrative record.

issues this Memorandum Opinion and Order finding that Plaintiff has stated no claim that survives summary dismissal.

## I. BACKGROUND[2]

In December 2013, Plaintiff was facing three charges of driving while intoxicated. *See* Compl. ¶ 10. On December 30, 2013, he was involuntarily committed to BSSH for a "competency restoration" to stand trial on those charges. *Id.* A Psychiatric Evaluation of that same date shows that BSSH admitted him with a fair prognosis and no acute psychiatric symptoms. R. 1-3. He was expected to stay at BSSH for a month or more. *Id.* at 3.

On December 31, 2013,[3] Dr. Cormack initially consulted with Plaintiff, who informed her that he had been unlawfully transferred to the facility as an act of retaliation and that he was competent to stand trial. Compl. ¶¶ 12-15. He also informed her that Dr. Jarvis Wright had him complete a Minnesota Multiphasic Personality Inventory II ("MMPI II") in July 2013 and commented that Plaintiff "was competent enough to be an astronaut." *Id.* ¶¶ 22-24. Plaintiff urged Dr. Cormack to obtain the test results if they were missing from his file. *Id.* ¶ 25. At the initial consultation, Dr. Cormack told Plaintiff that it was apparent he was "very manic" and that he would remain at BSSH "for a long time." *Id.* ¶ 26.

Within the initial psychiatric consultation record, Dr. Cormack noted that Plaintiff exhibited "significant mood swings with hostility, agitation, impulsivity, intrusiveness, [and] is grandi-

___

[2]The factual background is taken from Plaintiff's complaint as supplemented by the administrative record and his testimony at the *Spears* hearing. For purposes of screening, the Court views Plaintiff's factual allegations in accordance with *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

[3]Plaintiff approximated the date of the initial consult as January 7, 2014. Compl. ¶ 14. However, based upon the administrative record, Dr. Cormack initially assessed Plaintiff's psychiatric condition on December 31, 2013. *See* R. 37-39 (Physician Progress Note for assessment of Dec. 31, 2013).

ose, appears paranoid, has no understanding or willingness to accept the court proceedings which have occurred." *See* R. 37.  The doctor further noted that Plaintiff "is verbally aggressive with pressured speech, cursing, swearing, [and] makes physical threats against the examiner, makes multiple threats to harm the examiner's career, and retaliate against the examiner." *See id.* Plaintiff refused to take medication for any mental illness. *Id.* Based on her "findings of appearance of mania, grandiosity, paranoia, suspiciousness related to this examiner, staff in the hospital and legal system, [Dr. Cormack's] presumptive diagnosis [was] Bipolar Disorder, Current Episode Mania with Psychotic Features." *Id.* at 39.  However, given "the complicated nature of this case," she also indicated that she would order psychological testing for diagnostic clarification. *Id.* The doctor also requested previous competency evaluations. *Id.*

Through an Application for Order to Authorize Psychoactive Medication – Forensic ("Application") signed on the date of the initial consultation, Dr. Cormack sought judicial authorization to involuntarily medicate Plaintiff on grounds that he had refused to voluntarily take medication despite the doctor's psychiatric diagnosis.  She opined that Plaintiff lacked the capacity to make a decision regarding drug administration due to his "poor judgment and insight due to mania and psychosis."  As characterized by Plaintiff, Dr. Cormack requested a court order from Howard County so that BSSH could place him on antipsychotic drugs without conducting any objective psychological testing to support her opinion as to his psychiatric condition. Compl. ¶¶ 30-31, 39.

After interviewing Plaintiff on December 31, 2013, a licensed social worker completed an assessment of his mental health on January 2, 2014.  R. 162-69.  In making her assessment,

3

she considered information obtained from the interview and records received on January 2, 2014,

from Jason D. Dunham, Ph.D., a licensed psychologist who had evaluated Plaintiff on November

8, 2013. R. 162-64. In her assessment, she extensively quoted Dr. Dunham's expert opinion:

> In sum, it is my opinion that Mr. Hoyt is not competent to stand trial at this time.
> His mental illness is currently severe and pronounced. His mania and thought dis-
> order render him virtually incapable of sustaining a requisite level of composure,
> focus and concentration. In addition, his capacity to formulate rational thoughts
> is rather concerning, and he seems quite paranoid. As such, his understanding and
> appreciation of his current legal situation seems impaired, at least on a rational
> level. Most importantly, however his ability to engage in a reasonable and ration-
> al manner with his attorney in order to assist in his own defense is extremely lim-
> ited. I do believe, however, that Mr. Hoyt can be restored to competency in the
> foreseeable future. He would require formal and intensive psychiatric treatment
> that can be closely observed. Alleviation of his symptoms should result in a
> marked improvement in his composure, rationality, and level of focus. It is rec-
> ommended that such competency restoration be conducted within an inpatient
> psychiatric setting so that appropriate medication can be best administered and
> monitored. The Court is advised that an order for involuntary administration of
> medication may be warranted should Mr. Hoyt refuse psychoactive medication.

R. 163. She later highlighted other portions of Dr. Dunham's psychological evaluation, includ-

ing: (1) "Mr. Hoyt presented as extremely manic, hostile, and irrational"; (2) his "mood is un-

stable, and his capacity for rational thought or communication is severely impaired"; (3) his

"mood and affect were elevated and irritable"; (4) "[b]ased upon his nonstop talking, high

energy, rapid and pressured speech, racing thoughts and level of unprovoked hostility, it was

clear that he is currently within a manic episode"; and (5) "he seems to be in serious need of

appropriate psychoactive medication at this time." R. 164.

Dr. Cormack conducted a mental status examination on January 2, 2014, which was "con-

sistent with all previous contact." R. 40. She made the following observations and findings:

He is disheveled. Hair is greasy and oily. He makes glaring staring eye contact

4

> in order to intimidate. He holds aggressive postures. He attempts to control the environment and manipulate. Speech is loud, pressured and often cursing. He is hyperactive and agitated. Mood is labile, elated and then irritable and hostile. Speech is loud, pressured and then decompensates. His thought process is illogical, circumstantial, tangential, and decompensates into flight of ideas. He makes subtle threats and then overt legal threats such as stating he will sue the examiner and report the examiner to multiple entities such as Civil Rights groups and legal entities. He is markedly grandiose. Judgment and insight is poor.

*Id.* Her recorded assessment was "Bipolar Manic with grandiose delusions vs. Delusional Disorder, Polysubstance Dependence." *Id.*

On January 7, 2014, Howard County issued a "Notice of Hearing on Application for Order Authorizing Psychoactive Medication - Forensic." BSSH staff left the notice on Plaintiff's bed. Compl. ¶ 29. As reported by Dr. Ruth Netscher, his mental status examination the next day was a "TOTAL contrast from last visit." R. 42. Although he continued to obsess with legal issues, he appeared at the exam "well groomed in a leather jacket." *Id.* He made appropriate eye contact and was cooperative. *Id.* His thought process remained circumstantial and tangential but it was logical. *Id.* He remained grandiose and appeared paranoid related to his court proceedings. *Id.* Dr. Netscher diagnosed a psychosis "now in remission" while assessing an "Adjustment disorder with psychosis." *Id.* The doctor restated Dr. Cormack's need for psychological testing to obtain diagnostic clarification given "the complicated nature of this case." R. 43. Dr. Netscher also reiterated the request for previous competency evaluations. *Id.*

On January 9, 2014, the County Court of Howard County conducted a hearing on the Application. *See* Order Authorizing the Administration of Psychoactive Medication – Forensic [hereinafter "Medication Order"] at 1. After Plaintiff's attorney announced ready to proceed, "all matters of fact and law were submitted to the Court." *Id.* The court found: (1) proper serv-

ice of all notices and copies of the Application; (2) compliance with all terms and provisions of

the Texas Mental Health Code; (3) an examining physician stated that Plaintiff "is in need of

psychoactive medication but lacks the capacity to make a decision regarding administration of

said medication and it is in Patient's best interest to have psychoactive medication"; and (4) the

same physician also stated that, without medication, the Plaintiff "presents a danger to self or

others in the mental health facility in which [he] is being treated." *Id.* Based on the evidence

presented, including the Application and expert psychiatric testimony, the court found clear and

convincing evidence to support the allegations of the Application and therefore authorized health

services to administer psychoactive medication to Plaintiff. *Id.* at 1-2.

Plaintiff was not permitted to present evidence or witnesses at the hearing, but was able

to testify on his own behalf. Compl. ¶¶ 40-41. Nor was he permitted to question or cross-exam-

ine Dr. Cormack's testimony. *Id.* ¶ 40. Furthermore, the psychological test administered by Dr.

Jarvis was suppressed during the hearing even though it was in the file and record. *Id.* ¶ 44.

Although Plaintiff had appointed counsel at the hearing, he was given no opportunity to speak

with his attorney. *Id.* ¶ 41. Although the Howard County court ordered that Plaintiff be admin-

istered psychoactive medication, BSSH did not immediately administer such medication. *See*

*id.* ¶¶ 32-33, 42, 46.

The day after the hearing, Dr. Netscher confronted Plaintiff about "how he had threatened

Dr. Cormack in court." R. 45. At first he disputed her presence at the hearing, then disputed the

authority of the court, and finally threatened a lawsuit for battery should BSSH implement the

court order. *Id.* The doctor informed Plaintiff that if he cooperated with staff psychologists,

6

BSSH "could be specific about whether he needs treatment." *Id.* She further informed him that BSSH would "be compelled to medicate him if his behavior became threatening." *Id.*

Plaintiff soon thereafter contacted Disability Rights of Texas and a representative interviewed him about a week later. Compl. ¶ 34. Following his review of Plaintiff's medical record, the representative recommended that the court order be rescinded. *Id.* Dr. Butler refused to follow that recommendation. *Id.* ¶¶ 35-36.

As of January 14, 2014, Plaintiff continued to refuse all psychoactive medications. *See* R. 47. On that date, Dr. Butler assessed Plaintiff's mental health status and found the exam "significant for hypomania, pressured speech, energization, and racing thought." *Id.* Dr. Butler reviewed a psychological evaluation of Plaintiff that had been completed while he was in San Angelo County lockup and found it consistent with his examination. *Id.* He found Plaintiff to suffer from Bipolar Disorder, with most recent episode being hypomanic. *Id.* Two days later, he noted that, "after several evaluations and interview sessions, it is absolutely clear that this patient is in fact either a bipolar I or bipolar II disorder." *See* R. 49. With his consent, Plaintiff was started on Keppra for mood stabilization, but remained off any psychoactive medications. *Id.*; *accord* R. 151.

The next week, Dr. Cormack noted Plaintiff's compliance and satisfaction with Keppra. *See* R. 51. She restated her presumptive diagnosis of Bipolar Disorder. *Id.* Plaintiff reported that Keppra had "helped [him] level out." R. 32; *accord* R. 53. A week later, Dr. Cormack assessed Plaintiff's mental status and noted "improved concentration"; competency class attendance; and "less covert threats than before," but "paranoid and grandiose themes in topics

of conversations" remained present. R. 53. Although the doctor found Plaintiff "more cooper-

ative overall," she further found "overall poor insight and judgment." *Id.* She assessed that

Plaintiff suffered from "Bipolar Manic with psychotic features." *Id.* Later that day, Plaintiff

visited "the RN office to express his displeasure" with a nurse who he alleged was "unpro-

fessional for waking him up th[at] morning to inform him the treatment team was on the way to

see him." R. 32. During that visit, Plaintiff "became increasingly verbally abus[ive] toward"

the nurse causing a different nurse to intervene and redirect him away from the office. *Id.*

On February 1, 2014, Plaintiff restated that Keppra had leveled out his mood. *Id.* A Feb-

ruary 7, 2014 progress note shows medication compliance and notes that Plaintiff "can become

verbally hostile and demeaning when he feels that his needs are not being met to his satisfaction

or other patients exhibit behaviors that he feels interfere with his daily routine." R. 33.

On February 6, 2014, John P. Pichitino, Ph.D., entered a Psychological Evaluation for

Plaintiff based upon a chart review, clinical interview, and testing conducted between January

13 and 21, 2014. R. 170-77. Dr. Pichitino, in conjunction with Michele Stranger, Pre-Doctoral

Psychology Intern, commenced the evaluation on January 13, 2014. R. 170, 177. The written

evaluation first summarizes notations from the November 8, 2013 competency evaluation of Dr.

Dunham.[4] R. 170.

The evaluation later summarizes Plaintiff's first session (January 13, 2014). R. 172.

During that session, Plaintiff focused on his legal issues and a prior MMPI-2 which showed that

he had the competency of an astronaut. *Id.* Records confirmed that Plaintiff had completed an

---

[4]Although the February 2014 evaluation does not mention Dr. Dunham by name, the summary is consistent with the evaluation of Plaintiff conducted on November 8, 2013. *Compare* R. 163 *with* R. 170.

MMPI-2 in July 2013, "but the protocol was invalid due to Mr. Hoyt's attempt to present himself in a more favorable light." *Id.*

During the clinical interview, Plaintiff "became argumentative and presented as grandiose at times." *Id.* He also inferred that he knew "more about psychology" than the evaluator. Among other things, he appeared "to believe that alcohol does not impair his ability to drive, as it does with others." *Id.* He reported that he had received treatment for depression when he was in his early twenties and was prescribed Prozac, Buspar, and Zyprexa for a year. R. 174. The evaluation indicates that Plaintiff did not exhibit any symptoms of mania other than his grandiose tendencies. *Id.* It further notes that BSSH staff had not reported "any unusual behavior" by Plaintiff, but staff did report that he "appears narcissistic in interactions with staff and peers" and had been upset on two occasions – when someone opened his mail and when he learned that "he was court-mandated to take medication." *Id.*

Plaintiff completed a Personality Assessment Inventory ("PAI") – an objective self-administered inventory demonstrated to have good reliability and validity. R. 174. His "results produced a valid protocol" but was unusual in that his Positive Impression scale score was above fifty considering that he took the test within a clinical setting. R. 174-75. Consistent with his history of drug and alcohol abuse, Plaintiff had two elevated clinical scale scores – Drug Problems and Alcohol Problems. R. 175. The evaluation notes that, although Plaintiff "did not endorse a significant level of depression, mania, or antisocial behaviors on the PAI, he has a history of depression, a past diagnosis of bipolar disorder, and has demonstrated antisocial traits." *Id.*

Plaintiff also completed a Million Clinical Multiaxial Inventory, Third Edition ("MCMI-

III"), which measures a subject's enduring traits and current state of distress. *Id.* This test "produced an invalid protocol" because his disclosure scale was below thirty-four. R. 175-76. The low score "suggests that he responded to items in a defensive and secretive manner, and therefore the clinical scales cannot be interpreted." R. 176.

Based upon all the information before them, the examiners found "insufficient evidence to support a diagnosis of Bipolar Disorder," and noted that his past drug abuse "makes it difficult to assess a past history of manic and depressive episodes." *Id.* The examiners further noted that Plaintiff's grandiosity "appears to better reflect narcissistic personality traits" and that Plaintiff only appears manic when discussing his legal issues. *Id.* The written evaluation thus recorded only one diagnostic impression – "Polysubstance Dependence, Sustained Full Remission in a Controlled Environment." R. 177.

An assessment of February 11, 2014, by Dr. Netscher shows "Psychosis NOS now in remission" but paranoia still present. *See* R. 54. Dr. Netscher also recorded the following assessments: (1) "Adjustment disorder with psychosis" and (2) "Personality Disorder NOS, antisocial traits, narcisstic traits." *Id.* She also noted that testing had been completed. R. 55.

On February 22, 2014, another BSSH patient entered Plaintiff's living area. Compl. ¶ 62. The patient had gone through Plaintiff's belongings at least six times and had stolen from him once or twice. *Id.* ¶¶ 63-64 (supplemented with hearing testimony). After Plaintiff threatened to kill the other patient, BSSH staff coerced[5] him to take medicine to calm him. *Id.* ¶¶ 66-

---

[5]Given the facts alleged by Plaintiff "coerced" properly characterizes the actions of staff. Because Plaintiff frames various issues in terms of forced or involuntary medication, the Court will treat the coercion the same as forced or involuntary medication for purposes of screening. *See Jones v. Hearn*, 248 F. App'x 568, 572-73 (5th Cir. 2007) (per curiam) (treating threats that caused the inmate to "fear for his physical safety" as forced medication). The Court,

75. A Dr. Gregory Paul ordered Zyprexa (10 MG oral tablet) to be administered for the psychiatric emergency caused by Plaintiff's threat to the other patient. R. 155. Nurse Brown told Plaintiff that if he refused to take the Zyprexa he would be transported to another building, strapped down, and forcibly injected with medication. Compl. ¶¶ 67-71. Given that choice, Plaintiff took the offered pill. *Id.* ¶ 75. The medicinal program started at 4:03 p.m. and stopped at 5:02 p.m. R. 155. According to his testimony at the *Spears* hearing, Plaintiff took the medicine just that one time. For twelve to fourteen hours after taking the pill, Plaintiff suffered great mental anguish, panic attacks, fear, and delusional paranoia with physical tremors, twitching, and shakes. Compl. ¶ 76.

By letter dated March 14, 2014, BSSH Superintendent Dunnam informed the criminal trial court that Plaintiff had "attained competency to stand trial" based upon a competency evaluation conducted by Chief Psychologist James Yeatts, Ph.D. The letter further informed the trial court that "[i]t is of vital importance that Mr. Hoyt continues medication therapy while awaiting trial" and that he was currently taking Keppra.

In January 2015, Plaintiff paid the filing fee and filed the civil complaint that is now before the Court. At that time, he was housed in Tom Green County Jail. Compl. at 44. This action concerns "the defendants' deliberate indifference, negligence, and intentional acts in relation to Plaintiff's medical and psychiatric treatment while involuntarily committed at Big Spring State Hospital." *Id.* at 1. He claims to have suffered an assault and battery and the intentional infliction of severe emotional distress while in the custodial care of BSSH. *Id.* He con-

---

however, makes no finding that Plaintiff was actually forced to involuntarily take the medication.

tends that his injury resulted from a wide-spread BSSH policy of deliberate indifference to patients' constitutional rights. *Id.* He claims that Dr. Cormack's application for court order, the Howard County court's order, and Dr. Butler's refusal to rescind that order directly and proximately caused his actual injury that occurred on February 22, 2014. *Id.* ¶ 38. He specifically limits this case to the time period after he was admitted to BSSH. *Id.* ¶ 54.

As relief in this action, Plaintiff seeks (1) a declaration that the acts and omissions set out in his complaint violated his Eighth and Fourteenth Amendment rights, (2) an order directing Defendants to correct his psychiatric file to reflect the findings of his objective diagnostic testing, (3) an injunction ordering that Howard County court proceedings held at BSSH must comply with due process standards for psychiatric hearings; (4) an injunction ordering BSSH to comply with nationally recognized psychiatric standards; (5) compensatory damages against the doctors and nurses; (6) nominal and punitive damages; and (7) attorney's fees and costs. *Id.* at 43-44.

On February 4, 2015, the Court denied Plaintiff's request to permit this case to proceed as a class action under Fed. R. Civ. P. 23. *See* Order (doc. 6). The Court thereafter received an authenticated administrative record and conducted a *Spears* hearing on June 11, 2015. *See* Minute Order. Three days prior to the hearing, the Court received a change of address showing that Plaintiff had been transferred to the Fort Stockton Detention Facility of the Texas Department of Criminal Justice. *See* Doc. 13. At the *Spears* hearing, the Court questioned Plaintiff about his claims and allegations. Among other things, Plaintiff stated that his primary concern is injunctive relief to protect the well being of patients at BSSH. Following the *Spears* hearing, Plaintiff filed a Post-Evidentiary Hearing Statement (doc. 16), a Declaration and Brief in Support

12

of his Prayer for Relief and his Terms for an Early Settlement (doc. 17), and a Declaration with Attached Exhibits in Support (doc. 18).  The Court now conducts the preliminary screening of this action as contemplated by 28 U.S.C. § 1915A.

## II. SCREENING

When Plaintiff commenced this action he was detained in a facility and accused of a criminal offense.  Accordingly, he is a prisoner within the meaning of 28 U.S.C. § 1915A. *See* 28 U.S.C. § 1915A(c).  As a prisoner seeking relief from an a governmental entity and officers or employees of such an entity his complaint is subject to screening pursuant to § 1915A. *See Martin v. Scott*, 156 F.3d 578, 579-80 (5th Cir. 1998).  The statute provides for *sua sponte* dismissal, if the Court finds the complaint "frivolous" or "malicious" or if it "fails to state a claim upon which relief may be granted" or "seeks monetary relief against a defendant who is immune from such relief."

The Court may find a claim frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  A claim lacks an arguable basis in law, furthermore, when it is "based on an indisputably meritless legal theory." *Id.* at 327.  A claim lacks an arguable basis in fact, when it describes "fantastic or delusional scenarios." *Id.* at 327-28.  A complaint fails to state a claim upon which relief may be granted, on the other hand, when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has

acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

"[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citation omitted).  A plaintiff, however, must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555; *accord Iqbal*, 556 U.S. at 678 (emphasizing that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").  Alleged facts must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  The alleged facts must "nudge" an asserted claim "across the line from conceivable to plausible" to avoid summary dismissal. *Id.* at 570.

### III.  DECLARATORY AND INJUNCTIVE RELIEF

As part of his requested relief, Plaintiff seeks a declaration that defendants violated his constitutional rights and an injunction to correct practices at BSSH.  Compl. at 43; Doc. 17 at 2-4, 17.  Plaintiff, however, has not been housed there since June 2015. *See* Doc. 13.  "Therefore, any claims for injunctive relief to correct procedures and practices at that facility are moot." *See Edwards v. Johnson*, 209 F.3d 772, 776 (5th Cir. 2000).  His transfer likewise renders his claim for declaratory relief moot.  *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001).  Any possibility of a transfer back to BSSH "is too speculative to warrant relief." *Id.*  For these reasons, Plaintiff will be unable to obtain the noted injunctive and declaratory relief.

14

Plaintiff also seeks injunctive relief to compel Defendants to correct an alleged psychiatric misdiagnosis within his permanent file by having his file reflect the findings of his objective diagnostic testing.  Compl. at 43; Doc. 17 at 2.  The Court finds no basis for issuing such injunctive relief.  His psychiatric file speaks for itself and already reflects objective findings from diagnostic testing.  As more thoroughly discussed later in this order, the record before the Court, including Plaintiff's well-pleaded factual allegations, is insufficient to find any constitutional violation despite Plaintiff's conclusion that his file is inaccurate.

## IV.  FEDERAL CLAIMS

Pursuant to 42 U.S.C. § 1983, Plaintiff claims that the nurses and doctors were deliberately indifferent to his (1) substantive and procedural due process rights to be properly diagnosed, in violation of the Due Process Clause of the Fourteenth Amendment and (2) the Eighth Amendment prohibition against cruel and unusual punishment.  Compl. ¶ 122.  He claims that the other defendants violated the Eighth and Fourteenth Amendments by failing to (1) establish policies, practices, and procedures to ensure that BSSH patients received appropriate psychiatric care and (2) ensure through training, supervision, and discipline, that staff at BSSH adhere to strict psychiatric diagnostic protocols promulgated by nationally recognized psychiatric associations.  *Id.* ¶ 123.  "Based on information and belief," he further claims that BSSH entered into corrupt contractual agreements with pharmaceutical companies, which created an incentive to disregard nationally acceptable psychiatric practices.  *Id.*

"Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United

States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (citation and internal quotation marks omitted).  To state a viable § 1983 claim for alleged deprivation of constitutional rights, the plaintiff must allege that (1) a state actor, i.e., a person or entity acting under color of state law, (2) deprived the plaintiff of a federal constitutional right. *Doe ex rel. Magee v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 867-69 (5th Cir. 2012) (en banc).

A plaintiff, moreover, may hold a municipality or local government entity liable under § 1983 "only for acts for which it is actually responsible." *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (1998); *accord Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986).  Municipal liability does not attach merely on a theory of respondeat superior or because an employee committed a tort. *Pembaur*, 475 U.S. at 479.  Requiring a plaintiff to identify a policy or custom that caused his or her injury "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997).

## A. Claims Against State Hospital

Big Springs State Hospital is a facility within the Texas Department of State Health Services. *See* Tex. Health & Safety Code § 532.001(b)(3) (West Supp. 2016).  Accordingly, for purposes of Eleventh Amendment immunity, BSSH is a state agency. *See May v. N. Tex. State Hosp.*, 351 F. App'x 879, 880 (5th Cir. 2009).  "The Eleventh Amendment bars suit in federal court against a state, or one of its agencies or departments, regardless of the nature of the relief requested." *Aubrey v. Weihert*, No. 1:15-CV-232-BL, 2016 WL 4480726, at *5 (N.D. Tex. July

16

28, 2016) (recommendation of Mag. J.), *adopted by* 2016 WL 4480968 (N.D. Tex. Aug. 23, 2016); *accord Moore v. La. Bd. of Elem. & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014).

Of course, Congress may abrogate that immunity through the Fourteenth Amendment, *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 72-76 (2000), and the State may waive its immunity by consenting to suit, *AT&T Commc'ns v. BellSouth Telecom. Inc.*, 238 F.3d 636, 643 (5th Cir. 2001). "Federal courts are without jurisdiction over suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." *Moore*, 743 F.3d at 963. "Texas has not consented by statute, and § 1983 does not abrogate state sovereign immunity." *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015); *accord Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Consequently, the Court has no jurisdiction over the § 1983 claims asserted against BSSH. *See Moore*, 743 F.3d at 963-64.

**B. Claims Against Superintendent**

Plaintiff sues Defendant Dunnam only in her official capacity as Superintendent of BSSH. Compl. ¶ 7. In general, an official-capacity suit is simply "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690, n.55 (1978)). Courts treat official-capacity suits "as a suit against the entity." *Id.* at 166. Moreover, when a plaintiff brings suit against both the entity and an individual in her official capacity under the same set of facts, the courts properly dismiss the official-capacity claims as duplicative. *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001).

17

Despite the jurisdictional bar to Plaintiff's claims against BSSH, "a federal court may enjoin a state official in his official capacity from taking future actions in furtherance of a state law that offends federal law or the federal Constitution." *Moore*, 743 F.3d at 963. For more than a century, the Supreme Court has "allowed suits against state officials for prospective injunctive relief to end a continuing violation of federal law under the doctrine of *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)." *AT&T*, 238 F.3d at 643. Through that "doctrine, a private party may sue individual state officers in federal court to obtain prospective relief from an ongoing violation of federal law." *Id.* at 647. "The essential ingredients of the *Ex parte Young* doctrine are that a suit must be brought against individual persons in their official capacities as agents of the state and the relief sought must be declaratory or injunctive in nature and prospective in effect." *Saltz v. Tenn. Dep't of Emp't Sec.*, 976 F.2d 966, 968 (5th Cir. 1992).

As previously discussed, Plaintiff's requests for injunctive and declaratory relief are moot or have no merit. He has no viable claim for prospective injunctive or declaratory relief that could survive under *Ex parte Young*. Furthermore, the *Ex parte Young* doctrine does not permit "a declaratory judgment that respondent violated federal law in the past." *See Green v. Mansour*, 474 U.S. 64, 74 (1985). Plaintiff's claims against Defendant Dunnam in this case merely duplicate his claims against BSSH. Consequently, such claims do not survive summary dismissal.

## C.  Claims Against Howard County

To hold a municipality liable under 42 U.S.C. § 1983 "requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is

the policy or custom." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 866 (5th Cir. 2012) (en banc). "Parties can sue a municipality that has violated their constitutional rights 'under color of any statute, ordinance, regulation, custom, or usage.'" *Advanced Tech. Bldg. Solutions, L.L.C. v. City of Jackson*, 817 F.3d 163, 165 (5th Cir. 2016) (quoting 42 U.S.C. § 1983 and citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). While official policy is normally "contained in duly promulgated policy statements, ordinances or regulations," it may also be evidenced by "a persistent, widespread practice of [municipal] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (citation omitted).

Regardless of the required proof needed to ultimately prevail on a given claim, courts examine the factual allegations of the operative pleading to determine whether asserted claims state a claim upon which relief may be granted. *Groden v. City of Dallas*, 826 F.3d 280, 282-83 (5th Cir. 2016) (addressing motion to dismiss). Claims within the operative pleading must contain sufficient factual allegations to comply with Fed. R. Civ. P. 8(a)(2) as interpreted in *Iqbal* and *Twombly*.

Plaintiff's complaint lacks the necessary factual allegations to state a municipal liability claim upon which relief can be granted. He makes no attempt to identify any policymaker and his filings identify no other BSSH patient who was subjected to involuntary medication. His complaint merely states in conclusory fashion that there is "a widespread policy at BSSH of deliberate indifference to patients' constitutional rights to the protections of substantive and

procedural due process." Compl. at 1. He later states "that the legal malpractice which occurred

in the Howard County court hearing held there on BSSH grounds was the result of the practicing

of a policy and custom of deliberate indifference to the plaintiff's procedural protections of Due

Process." *Id.* ¶ 47. In Count II he characterizes his policy-based claims as failures to (1)

establish policies, practices, and procedures to ensure that BSSH patients received appropriate

psychiatric care and (2) ensure through training, supervision, and discipline, that staff at BSSH

adhere to strict psychiatric diagnostic protocols promulgated by nationally recognized psychiatric

associations. *Id.* ¶ 123.

Just prior to setting out class action allegations in his complaint, Plaintiff states that from

his observations and experiences at BSSH, "it is apparent to Plaintiff that a policy and custom

is in force at BSSH which is incongruent with nationally recognized standards of medical safety

and protocols." *Id.* ¶ 88. He speculates that physicians may be motivated to force medication

upon patients for pharmaceutical research and over-bill federal and state funds. *Id.* ¶ 96. Based

on that speculation, he states

> upon information and belief . . . that, more likely than not, there is de facto policy
> in place at BSSH which is directly in violation of patients' civil liberty interests
> and civil rights in intentionally and with deliberate indifference to their long-term
> health and safety, encourages falsely diagnosing patients as having mental psychi-
> atric disorders, which they do not possess, for the incentive of financial gain from
> drug companies for the purpose of researching the physiological side-effects of
> the use of "psychoactive" pharmaceutical medications.

*Id.* ¶ 97. He then infers "that a lot of funds are thereby also wrongfully charged to the federal

medicaid service." *Id.* ¶ 98. In the next paragraph of his complaint, he sought class certification

after "[g]iving consideration to the probability of the longstanding widespread pervasiveness of

these constitutional violative policies and practices." *Id.* ¶ 99. He later states that he "is challenging a suspected policy and practice affecting the whole class of patients at BSSH." *Id.* ¶ 102. According to Plaintiff, based upon his class action allegations, he

> makes a naturally rational inference that the combination of these circumstances indicate that some improper policy of using both voluntarily and involuntarily committed patients as a kind of research pool for the use and side-effects research of psychiatric, and perhaps other drugs, contrary to the patients' own willingness and consent to be the subjects of such research, exists at BSSH.

*Id.* ¶ 110.

In denying Plaintiff's request for class certification, the Court characterized his factual allegations as "vague and conclusory and wholly insufficient to demonstrate that group fact questions predominate over the fact questions affecting each individual plaintiff." Order at 4-5. His testimony at the *Spears* hearing did not clear up the vagueness of his municipal liability claim and his factual allegations remain conclusory. Nor have his supplemental filings. *See* Doc. 16 at 2-3 ("This being the personal experience with which the plaintiff of this case faced – a rational inference may be drawn that the abovementioned situation is, in fact, the routine practice, policy, and custom conducted at Big Spring State Hospital and within the Howard County court hearings held on its premises."); Doc. 17 at 4 ("the inference is easily drawn that it is, most likely, the common practice and custom at BSSH"). It is clear from his complaint and supplemental filings that his allegations of policy and custom are based on speculation and unsupported inferences. He has identified no other incidents to infer a widespread customary policy. Plaintiff's conclusory and speculative allegations are insufficient to survive summary dismissal under 28 U.S.C. § 1915A. *See Prince v. Curry*, 423 F. App'x 447, 451 (5th Cir. 2011)

21

(per curiam).

For all of these reasons, Plaintiff's municipal liability claim against Howard County fails to state a claim upon which relief can be granted.

## D. Claims Against Individual Defendants

Against the nurses and doctors, Plaintiff asserts violations of due process under the Fourteenth Amendment and cruel and unusual punishment under the Eighth Amendment.  Compl. ¶ 122.

### 1. Due Process Claims

Inmates have "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221-22 (1990).  The Due Process Clause has both substantive and procedural components and the "procedural protections must be examined in terms of the substantive rights at stake." *Id.* at 220.  The substantive component involves defining the protected constitutional interest and identifying "the conditions under which competing state interests might outweigh it." *Id.* (quoting *Mills v. Rogers*, 457 U.S. 291, 299 (1982)).  The procedural component, on the other hand, "concerns the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance." *Id.* (same).

In more specific terms, "the substantive issue is what factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will; the procedural issue is whether the State's . . . mechanisms used to determine the facts in a particular case

22

are sufficient." *Id.* (addressing issues in similar but not identical context). In the prison context, an inmate may be treated with antipsychotic drugs against his will without violating the Due Process Clause when "the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest."[6] *Id.* at 227. This requires more than merely finding the inmate mentally ill and dangerous – a necessary prerequisite to those findings is a treating physician's "decision that medication is appropriate." *Id.* 223 n.8. Under *Washington*, "forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness." *Riggins v. Nevada*, 504 U.S. 127, 135 (1992).

### a. Substantive Due Process

Plaintiff claims that the doctors and nurses violated his substantive due process right to be properly diagnosed. Compl. ¶ 122. He further claims that prisoners have a significant liberty interest in avoiding unwanted administration of antipsychotic medication and a mentally competent adult has a due process right to refuse medical treatment. *Id.* ¶¶ 57-58.

Misdiagnosing a medical condition does not equate to a constitutional violation. To the extent Plaintiff may have a substantive due process claim on the alleged facts of this case, the substantive issue concerns the administration of antipsychotic drugs to Plaintiff against his will. However, even treating the coerced medication as alleged by Plaintiff as forced medication addressed in *Washington*, Plaintiff has no plausible substantive due process claim. As Plaintiff concedes, he was involuntarily committed to BSSH as incompetent to stand trial. There is ample

---

[6]Plaintiff incorrectly attributes this language to *Turner v. Safley*, 482 U.S. 78 (1987). *See* Compl. ¶ 60. As recognized in *Washington*, the *Turner* case concerned application of "the reasonableness standard to a prison regulation that imposed severe restrictions on the inmate's right to marry"; the case did not deal with involuntary administering medication. 494 U.S. at 224.

evidence in the record that he suffered from a mental illness during the relevant period, was a danger to others, and medication was appropriate. Multiple psychiatrists found that medication was appropriate for Plaintiff's diagnosed mental illness. Furthermore, the record is replete with references to Plaintiff being angry and hostile at times. Plaintiff's own statement that he would kill another inmate provides a sufficient basis to find him a danger to others.

Although Plaintiff disagrees with the diagnosis of a mental condition and any need for psychoactive medication, the Court cannot ignore the psychiatric record in this case. In addition, while he contends that BSSH personnel knew he was not mentally ill based on his statements to them, medical personnel must utilize a patient's statements in conjunction with their own observations and evaluations to determine a given patient's mental health. Despite his statements, everything of record indicates that Plaintiff was suffering from a mental illness during the relevant time and his mere statement that BSSH knew he was competent is simply conclusory. Furthermore, Plaintiff's statements that he was not mentally ill and did not need medication are not statements of fact. Rather they are medical conclusions of Plaintiff that the Court need not accept as true for purposes of screening under *Iqbal* and *Twombly*.

For all of these reasons, Plaintiff fails to state a substantive due process claim upon which relief can be granted under the facts of this case.

### b. Procedural Due Process

Plaintiff also claims that the doctors and nurses violated his procedural due process rights to be properly diagnosed. Compl. ¶ 122. He further claims a due process claim based on alleged procedural irregularities regarding the hearing of January 9, 2014. *Id.* ¶¶ 39-55. He bases both

of these claims on an alleged lack of objective testing prior to that hearing. *See id.* ¶ 39. He also bases the latter claim on a lack of opportunity to (1) present evidence or witnesses to rebut Dr. Cormack's opinion; (2) question or cross-examine Dr. Cormack's testimony at the hearing; and (3) speak with his court-appointed attorney. *Id.* ¶¶ 40-41. He claims that the Howard County court entered the Medication Order despite (1) his testimony about the unfairness and injustice of the hearing; (2) a lack of corroborating evidence to substantiate Dr. Cormack's diagnosis; and (3) contrary evidence that was suppressed during the hearing. *Id.* ¶¶ 42-44.

Procedural safeguards must exist "to ensure the prisoner's interests are taken into account." *Washington*, 494 U.S. at 233. Whether given procedural protections satisfy due process depends on "the rights and interests at stake in the particular case." *Id.* at 229. Due process "is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113 (1990). Procedural due process concerns the minimum constitutionally required procedures for the given circumstances. *Washington*, 494 U.S. at 220. As noted in the concurring opinion in *Washington*, the difficulty of involuntary medication cases "will be lessened, if in any appropriate case, the mentally ill patient is formally committed." 494 U.S. at 237 (Stevens, J., concurring).

In this case, Plaintiff was involuntarily committed to BSSH for competency restoration. *See* Compl. ¶ 10. Based upon a psychiatric examination by Dr. Dunham, he had already been found to be incompetent to stand trial before arriving at BSSH. *See* R. 163-64. After the commitment to BSSH, Dr. Cormack applied for judicial authorization to administer psychoactive medication to Plaintiff even without his consent. Plaintiff received notice of the judicial hearing

on that application. He received appointed counsel. Although he alleges procedural irregularities in the hearing process, the individual defendants had no responsibility for the alleged irregularities. Accordingly, Plaintiff has no plausible procedural due process claim against them based on any alleged procedural irregularities at the hearing.

Plaintiff also alleges that a lack of objective testing prior to that hearing violates his procedural due process rights. However, with respect to the hearing, a lack of objective testing merely affects the weight of the evidence presented. Even without objective testing at BSSH prior to the hearing, the trial court found clear and convincing evidence to support the allegations of the Application. No individual defendant in this action violated Plaintiff's procedural due process rights by not conducting objective testing prior to the hearing on the Application of Dr. Cormack.

The plausibility of this claim thus boils down to whether doctors and nurses may violate procedural due process by misdiagnosing or improperly treating a patient. Procedural due process, however, is not implicated in those circumstances. As the Supreme Court has stated, "the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials." *Davidson v. Cannon*, 474 U.S. 344, 348 (1986). While Plaintiff apparently contends that procedural due process requires objective psychological testing before diagnosis and treatment, medical personnel do not violate the Constitution by diagnosing or treating an inmate without first conducting objective testing. The need for and timing of objective testing falls within the judgment of the medical personnel.

For all of these reasons, Plaintiff has stated no due process claim upon which relief can

be granted against the individual defendants.

## 2. **Claims of Cruel and Unusual Punishment**

Neither the Fifth Circuit nor the Supreme Court has addressed whether the Cruel and Unusual Punishment Clause of the Eighth Amendment prohibits the involuntary medication of an inmate. Nevertheless, "the logical inference from [Supreme Court] holdings is that subjecting a prisoner to involuntary medication when it is not absolutely necessary or medically appropriate is contrary to the 'evolving standards of decency' that underpin the Eighth Amendment." *Thompson v. Bell*, 580 F.3d 423, 440 (6th Cir. 2009). For purposes of this memorandum opinion and order, the Court will assume without deciding that involuntarily medicating an inmate may violate the Eighth Amendment in some circumstances.

In this case, however, Plaintiff was not an inmate for purposes of the Eighth Amendment at any time relevant to his claims. Because he had not yet been convicted of the charged offenses, he was merely a pretrial detainee who had been involuntarily committed to BSSH. "Pretrial detainees and convicted prisoners . . . look to different constitutional provisions for their respective rights to basic needs such as medical care and safety." *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc). While "[t]he constitutional rights of a convicted state prisoner spring from the Eighth Amendment's prohibition on cruel and unusual punishment, and with a relatively limited reach, from substantive due process," the "rights of a pretrial detainee flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Id.* (citations omitted). Nevertheless, because there is "no constitutionally significant distinction between the rights of pretrial detainees and convicted inmates to basic human needs

. . . [an] official's constitutional liability to pretrial detainees for episodic acts or omissions [is] measured by a standard of subjective deliberate indifference as enunciated by the Supreme Court in *Farmer* [*v. Brennan*, 511 U.S. 825 (1994) ]." *Id.* at 643.

Under *Farmer*, there is no basis to hold an official liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837. Deliberate indifference requires that personnel either refused to treat the inmate, ignored complaints, "intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Tex. Dep't Crim. J.*, 239 F.3d 752, 756 (5th Cir. 2001). It is difficult to meet this standard and "an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference." *Id.* It is not sufficient to merely allege "medical malpractice." *Jones v. Hearn*, 248 F. App'x 568, 571 (5th Cir. 2007) (per curiam). Absent exceptional circumstances, furthermore, mere disagreement with medical treatment is likewise insufficient to state a claim for deliberate indifference. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006); *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001).

As discussed in a prior section, Plaintiff has no plausible substantive due process claim because the record shows that he was suffering from a mental illness during the relevant period, medication was appropriate for his diagnosis, and he was a danger to others. Consequently, under the facts of this case, the State could involuntarily medicate Plaintiff without violating substantive due process. For the same reasons, Defendants' actions in this case did not constitute

deliberate indifference under *Farmer*. Based on the factual allegations in this action, Defendants did not intentionally treat Plaintiff incorrectly or engage in any conduct that clearly evinces a wanton disregard for a serious medical need. The factual allegations of this case are insufficient to find a plausible claim based on the deliberate indifference of the individual defendants. Under the facts here, claiming that medical personnel misdiagnosed a psychiatric condition and forced him to take medication against his will does not state a plausible claim.

## V. STATE CLAIMS

In Count III of his complaint, Plaintiff sues Cormack, Brown, and Edmondson for medical malpractice, intentional infliction of severe emotional distress, assault, and battery. Compl. ¶¶ 124-25. Under Texas law, Plaintiff claims that these defendants were aware that he had no psychiatric issues requiring treatment, but disregarded generally acceptable psychiatric standards and put him on medication. *Id.* ¶ 124. These actions amounted to assault, battery, and intentional infliction of severe emotional distress. *Id.* ¶ 125. In Count IV of his complaint, he also claims that Defendants Butler, BSSH, and Dunnam are liable under state-law negligence theories. *Id.* ¶¶ 126-29.

The Texas Tort Claims Act ("TTCA") is the exclusive means to bring suit against Texas and its municipalities for common-law torts of their employees. *Franka v. Velasquez*, 332 S.W.3d 367, 369 (Tex. 2011); *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 659 (Tex. 2008). "The TTCA 'creates a limited waiver of sovereign immunity.'" *Goodman v. Harris Cnty.*, 571 F.3d 388, 394 (5th Cir. 2009) (quoting *Johnson v. Waters*, 317 F. Supp. 2d 726, 738 (E.D. Tex. 2004)). Despite the waiver, it "protects Texas and its municipalities from

liability for the intentional torts (including assault or battery) of State employees." *Hall v. Robinson*, 618 F. App'x 759, 761 (5th Cir. 2015) (per curiam). The TTCA "does not apply to claims arising out of an intentional tort." *Goodman*, 571 F.3d at 394 (citing Tex. Civ. Prac. & Rem. Code Ann. § 101.057(2); *Waters*, 317 F. Supp. 2d at 739). Similarly, the TTCA also excludes "allegations against a governmental unit arising out of the same conduct that formed the basis of the intentional tort claims against its employee." *Id.* In addition, "[i]ndividuals may not be sued under the TTCA as the act 'does not govern suits brought directly against an employee of the State.'" *Id.* (quoting *Huntsberry v. Lynaugh*, 807 S.W.2d 16, 17 (Tex. App. – Tyler 1991, no writ)).

When a plaintiff brings suit under the TTCA "against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." Tex. Civ. Prac. & Rem. Code Ann. § 101.106(e) (West 2011). Furthermore, although the TTCA does not permit suits against employees of a governmental unit in their individual capacity, it does contemplate official capacity suits against such employees and provides a means for the employee to obtain dismissal of the suit if the plaintiff does not amend the complaint to name the governmental unit. *See id.* § 101.106(f). Section 101.106(f) provides:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

The intent behind § 101.106(f) is to "force a plaintiff to decide at the outset whether an employee

acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable." *Tex. Adjutant Gen. Office v. Ngakoue*, 408 S.W.3d 350, 354-55 (Tex. 2013) (quoting *Garcia*, 253 S.W.3d at 657). Further, § 101.106(f) is intended "to ensure that tort claims within the purview of the Act do not proceed against a government employee for conduct within the scope of his employment." *Tex. Dep't of Aging & Disability Servs. v. Cannon*, 453 S.W.3d 411, 418 (Tex. 2015).

In some circumstances, § 101.106(f) "provide[s] government employees immunity from suit." *Tipps v. McCraw*, 945 F. Supp. 2d 761, 766 (W.D. Tex. 2013) (citing *Univ. of Tex. Health Sci. Ctr. v. Bailey*, 332 S.W.3d 395, 401 (Tex. 2011)). Under § 101.106(f), employee defendants are entitled to dismissal when the claims asserted against them (1) are "based on conduct within the scope of the defendant's employment with a governmental unit and (2) could have been brought against the governmental unit under the Tort Claims Act." *Id.* The TTCA "strongly favors dismissal of governmental employees." *Id.*

For purposes of § 101.106 of the TTCA, the courts treat "all tort theories alleged against a governmental unit" as arising under the TTCA. *Garcia*, 253 S.W.3d at 659; *accord Bustos v. Martini Club Inc.*, 599 F.3d 458, 464 (5th Cir. 2010). Consequently, Plaintiff's tort claims arise under the TTCA even though he does not specifically invoke the statute.

Here, Plaintiff sues BSSH, its Superintendent in her official capacity, and four employees in their individual capacities. *See* Compl. ¶¶ 3-4, 6-7. Plaintiff alleges that all of the individual defendants "were acting as agents, servants, and/or employees" of BSSH "and were acting within the scope and course of their employment" at all times relevant to his complaint. *Id.* ¶ 8. As

31

previously stated, BSSH is a facility within the Texas Department of State Health Services, *see* Tex. Health & Safety Code Ann. § 532.001(b)(3) (West Supp. 2016), and is a state agency for Eleventh Amendment immunity purposes, *see May v. N. Tex. State Hosp.*, 351 F. App'x 879, 880 (5th Cir. 2009).   Moreover, a state hospital is a governmental unit within the meaning of § 101.106. *See Austin State Hosp. v. Graham*, 347 S.W.3d 298, 301 (Tex. 2011).

Under § 101.106(e), the BSSH employees are entitled to dismissal on motion by BSSH. Accordingly, for screening purposes, Plaintiff has asserted no state claim against the individual defendants upon which he is entitled to relief.   Furthermore, because the alleged torts are based on conduct within the scope of the individual defendants' employment at BSSH, § 101.106(f) provides an alternative basis to dismiss the individual defendants even if § 101.106(e) were inapplicable.  Since the *Franka* decision, Texas law provides that, for purposes of § 101.106(f), a claim could have been brought under the TTCA against the governmental entity whether or not the TTCA waives immunity from suit.  332 S.W.3d at 385.   Consequently, for purposes of § 101.106(f), intentional torts may be brought against the entity under the TTCA.  *Alexander v. Walker*, 435 S.W.3d 789, 792 (Tex. 2014).  Accordingly, Plaintiff could have brought his tort claims against the governmental unit.

In light of §§ 101.106(e) and (f), Plaintiff has no viable tort claim against the individual defendants, including the Superintendent who he sues only in her official capacity.  Thus, Plaintiff may not pursue his tort claims against them.  In addition, Plaintiff may not pursue his intentional tort claims even against BSSH because Texas has excluded such claims from the limited waiver of immunity set out in the TTCA.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.057(2)

32

(West 2011). The State and its agencies enjoy immunity from suit for intentional torts of their employees.

Furthermore, when "the essence of a claim under the TTCA arises from an intentional tort, allegations of negligence are insufficient to avoid the § 101.057 exception to liability." *Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 761 (S.D. Tex. 2011) (quoting *Holland v. City of Houston*, 41 F. Supp. 2d 678, 713 (S.D. Tex. 1999)). To some extent, the essence of Plaintiff's negligence claim may arise from the same alleged facts as his intentional torts and thus invoke the § 101.057 liability exception.

To the extent the factual allegations support pursuit of a simple negligence claim against BSSH, that agency enjoys sovereign immunity against such claim in this Court. While "the State of Texas has waived its sovereign immunity to the extent of liability created by the TTCA, Texas has waived 'sovereign immunity in state court only.'" *Smithback v. Texas*, No. 3:07-CV-0288-M, 2007 WL 1518971, at *16 (N.D. Tex. May 24, 2007) (accepting recommendation of Mag. J. quoting *Sherwinski v. Peterson*, 98 F.3d 849, 852 (5th Cir.1996)). In Texas, suits under the TTCA "shall be brought in state court in the county in which the cause of action or a part of the cause of action arises." Tex. Civ. Prac. & Rem. Code Ann. § 101.102(a) (West 2011). "A state's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Sherwinski*, 98 F.3d at 852 (quoting *Welch v. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 473 (1987)). As the Supreme Court has emphatically stated: "a state's consent to SUIT IN ITS OWN COURTS IS NOT A waiver of its immunity from suit in federal court." *Sossamon v. Texas*, 563 U.S. 277, 285 (2011). Consequently, Plaintiff has stated no

claim under the TTCA which entitles him to relief in this federal action against BSSH.

## VI.  LEAVE TO AMEND

In general, courts should provide pro se litigants an opportunity to amend before dismissing a complaint. *See Brewster v. Dretke*, 587 F.3d 764, 768 (5th Cir. 2009). Leave to amend is not required, however, when plaintiffs have already pled their "best case." *Id.* Whether to grant leave to amend is within the Court's sound discretion. *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003). In this instance, Plaintiff has presented a thorough, well-structured complaint that he has supplemented through testimony at the *Spears* hearing and through subsequent filings with the Court. Accordingly, the Court finds that he has pled his best case and that there is no basis to permit an amendment at this time.

## VII.  CONCLUSION

After considering Plaintiff's complaint, supplemental filings, testimony from the evidentiary hearing, the administrative record, and the applicable law, the Court dismisses this action pursuant to 28 U.S.C. § 1915A for Plaintiff's failure to state a claim upon which relief may be granted and seeking monetary relief against a defendant who is immune from such relief.

**IT IS SO ORDERED this _8_ th day of December, 2016.**

**E. SCOTT FROST**
**UNITED STATES MAGISTRATE JUDGE**